**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA**

SEAN WELLS and UNITED PHYSICAL
THERAPY ASSOCIATION,

*Plaintiffs*,

*v.*

ROBERT F. KENNEDY, in his official
capacity as Secretary of Health and Human
Services,

*Defendant*.

No. 3:25-cv-00919-WWB-MCR

**DEFENDANT'S RULE 12(b)(6) MOTION TO DISMISS**

**INTRODUCTION**

Medicare is an enormously successful federal program that, since its inception, has allowed millions of elderly Americans to obtain affordable healthcare, sparing them the specter of financial ruin due to medical expenses in the twilight of their lives.  A key part of that program is its requirement that healthcare professionals treating Medicare beneficiaries charge them no more than a maximum fee permitted by law.  By its careful scheme, Medicare aims to ensure ready access to healthcare for its beneficiaries around the country, while holding down costs not only for those beneficiaries but also for the federal Government itself.

But in its considered judgment, Congress has crafted an exception to that general rule.  Under 42 U.S.C. § 1395a(b), some—but not all—healthcare professionals may "opt out" of Medicare and enter into private contracts with Medicare beneficiaries, allowing those professionals to charge a privately determined rate for their services. In enacting that exception, Congress took a measured risk: if too many healthcare professionals took advantage of the opt-out scheme, middle-class Medicare beneficiaries were likely to be priced out of obtaining care from those professionals, leaving them with a shrinking pool of professionals to whom they could turn.

Congress chose not to take that risk with respect to physical therapists. Frustrated at their inability to enter into private contracts with their Medicare-beneficiary patients, Plaintiffs sued, arguing that § 1395a(b) violates the constitutional rights of physical therapists to the due process and equal protection of law, and exceeds Congress's power to enact.  But Plaintiffs' claims fail to identify any constitutional infirmity here.  Section 1395a(b)'s limitation on private contracting infringes no

1

fundamental right of physical therapists, nor discriminates on the basis of a suspect classification. Accordingly, their due-process and equal protection claims fail so long as the statute clears the low bar of rational-basis scrutiny, which it easily does. Likewise, § 1395a(b) is well within Congress's interstate-commerce power to enact, because limiting private contracting with Medicare beneficiaries is an essential part of Medicare's comprehensive regulation of a national healthcare market.

Accordingly, the Court should dismiss Plaintiffs' Complaint, in its entirety, for failure to state a claim to relief.

## BACKGROUND

In 1965, Congress amended the Social Security Act to enact Medicare, a national healthcare program designed to ensure widespread and cost-effective access to healthcare services for millions of elderly and disabled Americans. *See* Pub. L. 89-97, 79 Stat. 286 (1965) (creating federal Medicare and Medicaid programs). In the decades since, that program has been repeatedly revised to yield the multi-part, comprehensive Medicare scheme that exists now. Today, Medicare Part A covers inpatient hospital stays and related post-hospitalization benefits for eligible individuals who become automatically entitled to those benefits upon reaching the age of sixty-five. *See* 42 U.S.C. §§ 426, 1395c–1395i-6. Part B establishes a voluntary supplemental insurance program that pays for certain physician and other outpatient services, diagnostic and clinical laboratory tests, and durable medical equipment. *Id.* §§ 1395j–1395w-6; *see also* 42 C.F.R. §§ 410.1–410.175 (outlining scope of Part B benefits). Anyone entitled to benefits under Part A may "elect to enroll" in Part B by paying a specified monthly premium, and may disenroll at any time. *See* 42 U.S.C. §§ 1395j,

2

1395*o*.  Part C enables Medicare recipients to receive the benefits of Parts A and B through privately managed care plans.  *See id.* §§ 1395w-21–1395w-28.  And Part D authorizes private insurers to offer Medicare beneficiaries federally subsidized insurance plans for prescription drugs.  *See id.* §§ 1395w-101–1395w-154.

This case arises under Part B.  Under that Part, a physician or healthcare practitioner who provides a medical service to a Part B beneficiary must comply with various requirements.  First, the physician or practitioner must submit a claim form identifying the service provided.  *See* 42 U.S.C. § 1395w-4(g)(4)(A)(i).  Second, when a physician or practitioner treats a Medicare beneficiary, that professional may not charge the beneficiary more for the care provided than the "limiting charge" permitted by federal regulations.  42 U.S.C. § 1395w-4(g)(1)–(2); 42 C.F.R. §§ 414.48, 424.55.  Each requirement serves to protect both beneficiaries and the Medicare program itself: the mandatory submission of claims allows Medicare to monitor the medical care provided to program beneficiaries, and the limiting charge caps the amount that providers may be paid for their services.

More than three decades after Medicare's enactment, Congress passed the Balanced Budget Act of 1997, which amended the Medicare program in several key respects.  *See* Pub. L. 105-33, 111 Stat. 251 (1997).  Among the revisions was that codified at 42 U.S.C. § 1395a(b), which permitted certain healthcare professionals, under specific conditions, to opt out of Medicare and enter into private contracts for healthcare services with Medicare beneficiaries, thereby allowing those professionals to set their own rates for compensation.  As it exists today, § 1395a(b) permits "a physician or practitioner" to "enter[] into a private contract with a [M]edicare beneficiary

for any item or service" usually covered by that program, so long as various statutory requirements are met. The physician or practitioner must receive no reimbursement from Medicare for the care provided; the contract must be writing and entered into when the beneficiary is not "facing an emergency or urgent health care situation"; and the contract must "clearly indicate to the [M]edicare beneficiary" that by entering the contract, the beneficiary chooses to forego Medicare coverage for the relevant care and takes sole responsibility for the payment of bills for that care, which are unconstrained by statutory limitations. § 1395a(b)(1)–(2). Further, opt-out physicians and practitioners must "file with the Secretary" of the United States Department of Health and Human Services (HHS) an "affidavit" attesting that the healthcare professional "will not receive any reimbursement" from Medicare "for any item or service provided to any [M]edicare beneficiary" for a two-year period. § 1395a(b)(3)(A)–(B).

The "physician or practitioner" to which these provisions apply, however, is carefully prescribed by statute. "The term 'physician,'" the statute explains, "has the meaning given such term by paragraphs (1), (2), (3), and (4) of [42 U.S.C. §] 1395x(r)." § 1395a(b)(6)(B). Paragraphs (1)–(4) of § 1395x(r), in turn, list "a doctor of medicine or osteopathy"; "a doctor of dental surgery or of dental medicine"; "a doctor of podiatric medicine"; and "a doctor of optometry." Similarly, the opt-out statute defines "the term 'practitioner'" to incorporate "the meaning given such term by [42 U.S.C. §] 1395u(b)(18)(C)," which in turn lists "[a] physician assistant, nurse practitioner, or clinical nurse specialist"; "[a] certified registered nurse anesthetist"; "[a] certified nurse-midwife"; "[a] clinical social worker"; "[a] clinical psychologist"; "[a] registered dietitian or

4

nutrition professional"; "[a] marriage and family therapist"; and "[a] mental health counselor."

The list of "physician[s] or practitioner[s]" to whom the opt-out scheme is available does not include physical therapists.  So in August 2025, Plaintiffs sued the Secretary of HHS, who is the federal official charged with implementing § 1395a(b).  *See generally* Compl.; *see also id.* ¶ 21.  Plaintiff United Physical Therapy Association (UPTA) is "a nonprofit professional association of licensed physical therapists," the mission of which is "to eliminate unnecessary barriers that prevent physical therapists from practicing their profession and serving their patients."  *Id.* ¶¶ 19–20.  Plaintiff Sean Wells is "a licensed physical therapist … and a member of [the] UPTA."  *Id.* ¶ 17.  Together, Plaintiffs complain that because physical therapists are excluded from Medicare's opt-out provisions, those professionals are harmed by their inability to treat Medicare-eligible patients unless they accede to Medicare's careful guidelines and limited reimbursement rates.  *Id.* ¶¶ 27–32, 46, 57, 59.

Accordingly, Plaintiffs seek a declaratory judgment that § 1395a(b) is unconstitutional, and a permanent injunction against the Secretary prohibiting the implementation or enforcement of the opt-out rules against physical therapists.  Compl. at 20.  They claim that the exclusion of physical therapists from Medicare's opt-out provisions violates the rights of physical therapists to the equal protection and due process of law under the Fifth Amendment, *see id.* ¶¶ 76–88, and that § 1395a(b) was beyond the power of Congress to enact, *see id.* ¶¶ 89–96.  The Secretary now moves the Court to dismiss Plaintiffs' Complaint, in its entirety, for failure to state a claim upon which relief may be granted.

**LEGAL STANDARD**

To survive a motion to dismiss under Rule 12(b)(6), the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation cleaned).  A claim is plausible on its face when it contains facts sufficient to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ibid.* Courts should not, however, accept as true allegations in a complaint that are merely legal conclusions.  *Ibid.*  "To that end," the Eleventh Circuit has "counseled that the first step in evaluating a motion to dismiss is to eliminate any allegations in the complaint that are merely legal conclusions."  *Holland v. Carnival Corp.*, 50 F.4th 1088, 1093 (11th Cir. 2022) (quotation cleaned).  Further, "'threadbare recitals of the elements of a cause of action' and 'conclusory statements' are insufficient," *ibid.* (quoting *Iqbal*, 556 U.S. at 678), as is "an unadorned, the-defendant-unlawfully-harmed-me accusation," *Iqbal*, 556 U.S. at 678.  Instead, the complaint must allege sufficient facts to "'nudge [the plaintiff's] claims across the line from conceivable to plausible.'"  *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

**ANALYSIS**

I.     **PLAINTIFFS FAIL TO STATE AN EQUAL-PROTECTION OR DUE-PROCESS CLAIM UNDER THE FIFTH AMENDMENT**

The Fifth Amendment to the Federal Constitution provides, in relevant part, that "[n]o person shall be … deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.  Despite that provision's facial protection of *procedural* rights, the Supreme Court has for decades interpreted the Fifth Amendment's due-process

6

guarantee "to include a *substantive* component."  *Reno v. Flores*, 507 U.S. 292, 301–02 (1993) (emphasis added).  That "substantive component," as relevant to this case, has two effects.

First, it generally forbids the federal government from "infring[ing] certain 'fundamental' liberty interests *at all*, no matter what process is provided."  *Id.* at 302.  If a statute does infringe on such "fundamental" rights, it is constitutional only if it passes strict judicial scrutiny—that is, if it is "narrowly tailored to serve a compelling state interest." *Ibid.*  In the absence of such infringement, however, the statute need only survive rational-basis review—that is, the statute "must be sustained if there is a rational basis on which the legislature could have thought that it would serve legitimate … interests."  *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 301 (2022).

Second, the "substantive component" of the Fifth Amendment's due-process clause implicitly encompasses a right expressly outlined in a different provision of the Constitution altogether:  the Fourteenth Amendment, which provides in relevant part that "[n]o State shall … deny to any person … the equal protection of the laws."  U.S. Const. amend. XIV.  As the Supreme Court and Eleventh Circuit have explained, "'[a]lthough the Fifth Amendment contains no equal protection clause, it does forbid discrimination that is so unjustifiable as to be violative of due process.'"  *Gary v. City of Warner Robins, Ga.*, 311 F.3d 1334, 1337 n.4 (11th Cir. 2002) (quoting *Johnson v. Robison*, 415 U.S. 361, 364 n.4 (1974)).  Accordingly, in what is sometimes called "reverse incorporation," *Morrissey v. United States*, 871 F.3d 1260, 1268 n.6 (11th Cir. 2017), "'if a classification would be invalid under the Equal Protection Clause of the Fourteenth Amendment, it is

7

also inconsistent with the due process requirement of the Fifth Amendment,'" *Gary*, 311 F.3d at 1337 n.4 (quoting *Johnson*, 415 U.S. at 364 n.4).

Because "the equal protection guarantee of the Fifth Amendment is co-extensive with that of the Fourteenth Amendment," *Howard v. McLucas*, 871 F.2d 1000, 1006 n.8 (11th Cir. 1989), a court's "approach to Fifth Amendment equal protection claims" should be "precisely the same as to equal protection claims under the Fourteenth Amendment," *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 217 (1995) (quotation cleaned); *see also ibid.* ("in case after case, fifth amendment equal protection problems are discussed on the assumption that fourteenth amendment precedents are controlling" (quotation cleaned)).  And when, as here, a plaintiff challenges "social [or] economic legislation" on equal-protection grounds, courts apply a well-worn test: whether the legislation "employ[s] suspect classifications or impinge[s] on fundamental rights."  *Estate of McCall ex rel. McCall v. United States*, 642 F.3d 944, 950 (11th Cir. 2011).  If so, strict judicial scrutiny applies to that statute.  *See Morrissey*, 871 F.3d at 1268.  But if "no fundamental right or suspect class is implicated," the statute passes constitutional muster if it survives mere rational-basis review.  *Ibid.*; *see also Romer v. Evans*, 517 U.S. 620, 631 (1996) (same).

Not coincidentally, the "fundamental rights" element of the equal-protection analysis aligns neatly with the "fundamental liberty interests" evaluation at the heart of the substantive due-process analysis.  *Cf. Morrissey*, 871 F.3d at 1268–69 (describing single fundamental-rights test "for either substantive due process or equal protection purposes"); *id.* at 1269 n.7 ("In determining whether a right is sufficiently 'fundamental' to trigger strict equal protection scrutiny, this Court has sensibly sought guidance in substantive due process jurisprudence"); *Doe v. Moore*, 410 F.3d 1337, 1346 (11th Cir. 2005) (importing

8

fundamental-rights evaluation from preceding due-process analysis into equal-protection analysis); *Locke v. Shore*, 634 F.3d 1185, 1195 (11th Cir. 2011) (outlining standard of review as to due-process and equal-protection challenges together, because right at issue "not a fundamental one"). Accordingly, Secretary Kennedy's argument below addresses Plaintiffs' Fifth Amendment due-process and equal-protection claims together, proceeding in three parts. First, as to both claims, § 1395a(b) implicates no fundamental right triggering heightened judicial scrutiny. Second, as to the equal-protection claim, § 1395a(b) implicates no suspect classification triggering heightened scrutiny. Third, because no fundamental right or suspect classification is at issue, only rational-basis review applies. And because the statute easily satisfies rational-basis review, the Court should dismiss Plaintiffs' claims under the Fifth Amendment's due-process clause.

### A.    The Exclusion of Physical Therapists from Medicare's Opt-Out Provisions Implicates No Fundamental Rights

To determine whether a right is "fundamental" for due-process purposes, courts consider "two categories of substantive rights." *Dobbs*, 597 U.S. at 237. "The first consists of rights guaranteed by the first eight Amendments." *Ibid.* The second comprises fundamental rights protected by the Constitution but unenumerated anywhere therein. *Ibid.* Here, Plaintiffs' allegedly infringed right—that "of individuals to pursue their chosen occupation and to enter into contracts," Compl. ¶ 84—falls nowhere among the Constitution's enumerated rights. Accordingly, whether § 1395a(b) infringes a fundamental right depends on the existence of an unenumerated, but fundamental, constitutional right. "That analysis … must proceed with 'utmost care' because of the dangers inherent in the process of elevating extra-textual rights to constitutional status,

9

thereby removing them from the democratic field of play." *Williams v. Atty. General of Ala.*, 378 F.3d 1232, 1239 (11th Cir. 2004).

In evaluating "any claim that a right is 'fundamental,'" the Court "must begin with a careful description of the asserted right." *Morrissey*, 871 F.3d at 1269. And "[o]ne of the cardinal rules" of that description is that "the scope of the asserted right—and thus the parameters of the inquiry—must be dictated by the precise facts of the immediate case." *Williams*, 378 F.3d at 1240 (quotation cleaned). More specifically, "the scope of the liberty interest at stake … must be defined in reference to the scope of the [challenged] statute." *Id.* at 1241. Here, that statute is § 1395a(b), which provides that certain healthcare professionals may enter into private contracts for their services with Medicare beneficiaries if specified statutory conditions are met.

Immediately, the first flaw in Plaintiffs' Fifth Amendment claims becomes apparent: they fail to define their asserted right with any reference to the statute they challenge. The supposed "right of individuals to pursue their chosen occupation and to enter into contracts … free from arbitrary and irrational government interference," Compl. ¶ 84, comes nowhere close to the sort of carefully defined right required at the start of any fundamental-rights analysis. Instead, Plaintiffs can only prevail if some right—one carefully described by reference to the challenged statute—is so fundamental that the statutory restriction cannot stand. In light of the challenged statute, the supposed "fundamental" right must be that of physical therapists to enter into private contracts for their services with Medicare beneficiaries.

"With this careful description in mind," the Court must then "turn … to the second prong of the fundamental-rights inquiry": whether the carefully designated right is

10

"objectively, deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if it were sacrificed." *Williams*, 378 F.3d at 1242 (citing *Washington v. Glucksberg*, 521 U.S. 702 (1997), and describing two-part "*Glucksberg* analysis"); *see also Eknes-Tucker v. Gov. of Ala.*, 80 F.4th 1205, 1220 (11th Cir. 2023) (same). Plaintiffs' Complaint makes no effort to satisfy those requirements, and in any event could not satisfy either one. The right to enter into private contracts with Medicare beneficiaries can hardly be "deeply rooted in this Nation's history and tradition" when Medicare itself did not exist until 1965. *See* Pub. L. 89-97, 79 Stat. 286 (creating federal Medicare and Medicaid programs). In fact, the ability of *any* healthcare professional to enter into private contracts with Medicare beneficiaries did not exist until three decades later in 1997, when Congress amended the Medicare statute to permit certain professionals to enter into such contracts—and in those cases, only if the contract complied with strict statutory requirements, and only after the professional had signed an affidavit agreeing not to "submit any claim … for any items or service provided to any [M]edicare beneficiary … during the 2-year period beginning on the date the affidavit is signed." *See* 42 U.S.C. § 1395a(b) (1997). Likewise, "liberty" and "justice" are hardly extinguished by Congress's decision to shield Medicare beneficiaries from private contracts with certain—or even all—healthcare professionals. *Williams*, 378 F.3d at 1242.

In fact, Plaintiffs' Complaint does not attempt to satisfy the *Glucksberg* analysis for even their more broadly defined right. Nor could it: the Supreme Court has "held for many years … that the 'liberties' protected by substantive due process do not include economic liberties." *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*,

11

560 U.S. 702, 721 (2010) (plurality op.).  Plaintiffs' contrary invocation of physical therapists' economic rights as "fundamental" "propels us back to what is referred to (usually depreciatingly) as 'the *Lochner* era'"—that is, the now-repudiated New Deal era in which economic legislation was routinely invalidated on substantive due-process grounds.  *Stop the Beach*, 560 U.S. at 721 (plurality op.) (citing *Lochner v. New York*, 198 U.S. 45 (1905)).  But as early as 1937, the Supreme Court terminated that era when it decided *West Coast Hotel Co. v. Parrish*, 300 U.S. 379 (1937), which "signaled the demise of an entire line of important precedents that had protected an individual liberty right against state and federal health and welfare legislation."  *Dobbs*, 597 U.S. at 265.  In 1963, the Supreme Court repeated that "[t]he doctrine that prevailed in *Lochner* … has long since been discarded."  *Ferguson v. Skrupa*, 372 U.S. 726, 730 (1963).  And in any event, the Supreme Court "has never held that the right to pursue a particular occupation is a fundamental right."  *Jones v. Bd. of Comm'r of Ala. State Bar*, 737 F.2d 996, 1000 (11th Cir. 1984).

Whether on Plaintiffs' broadly defined right or on the properly circumscribed right, this Court should not heed Plaintiffs' invitation to return to the *Lochner* era, or to expand substantive due-process protections when the Supreme Court has been so "reluctant" to do so.  *Dobbs*, 597 U.S. at 239.  Such an "unprincipled approach" to the fundamental-rights analysis would constitute exactly the "freewheeling judicial policymaking that characterized discredited decisions such as *Lochner*" and its progeny.  *Id.* at 240.  Put simply, where, as here, Congress has expressed economic policy preferences for the national provision of healthcare to Medicare-eligible individuals, no fundamental right of healthcare professionals is at stake.  Accordingly, no more than rational-basis scrutiny

applies to § 1395a(b).  *Cf. Isaacs v. United States*, No. 87-15154, 1988 WL 142808, at *3–4 (9th Cir. Dec. 28, 1988) (unpublished opinion) (holding that Medicare provisions purportedly impairing "fundamental right of freedom to contract" are subject to no more than rational-basis scrutiny); *United Seniors Ass'n v. Shalala*, 2 F. Supp. 2d 39, 41–42 (D.D.C. 1998) (concluding, in constitutional challenge to § 1395a(b), that patients lack fundamental constitutional "right to privately contract with their physicians").

### B.    The Exclusion of Physical Therapists from Medicare's Opt-Out Provisions Implicates No Suspect Classification

"The Equal Protection Clause"—including as reverse-incorporated into the Fifth Amendment—"requires that the government treat similarly situated persons in a similar manner."  *Gary*, 311 F.3d at 1337 & n.4.  But that requirement "must coexist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons."  *Romer*, 517 U.S. at 631.  Accordingly, "[w]hen legislation classifies persons in such a way that they receive different treatment under the law, the degree of scrutiny the court applies" to that law "depends upon the basis for the classification."  *Gary*, 311 F.3d at 1337.  If the statute distinguishes between persons on the basis of a "suspect" or "protected" classification, "the court reviews the classification under strict scrutiny"; otherwise, equal-protection claims "are judged under the rational basis test."  *Ibid.*

The Supreme Court and Eleventh Circuit have, over time, identified those specific "suspect" or "protected" classifications that trigger more exacting judicial scrutiny of government action.  "Classifications based on race or national origin," for instance, "are reviewed under the most exacting level of scrutiny."  *Eknes-Tucker*, 80 F.4th at 1226 (quotation cleaned).  "[C]lassifications based on sex or illegitimacy,"

13

likewise, are subject to "a level of intermediate scrutiny." *Ibid.*  But all other kinds of legislative classifications need satisfy no more than rational-basis scrutiny.  *Ibid.*; *see also Moore*, 410 F.3d at 1346 (identifying "race, alienage, national origin, gender, or illegitimacy" as those classifications warranting heightened judicial scrutiny).

Here, § 1395a(b) does not distinguish between persons on the basis of any of those characteristics.  Instead, as Plaintiffs themselves note, it distinguishes between persons only on the basis of whether they are a "physician" or "practitioner" as defined in the statute.  *See* Compl. ¶¶ 77–78, 81.  Section 1395a(b) begins by permitting "a physician or practitioner" to opt-out of Medicare, § 1395a(b)(1); then circumscribes who may qualify as a "physician" or "practitioner" for purposes of that provision by importing some or all of the definitions of those terms from elsewhere in the Medicare statute, *see* § 1395a(b)(6)(B)–(C).  "Physician," the challenged statute explains, "has the meaning given … by paragraphs (1), (2), (3), and (4) of [§] 1395x(r) of" Title 42. § 1395a(b)(6)(B).  "Practitioner," the statute goes on, "has the meaning given … by [§] 1395u(b)(18)(C) of" Title 42.  § 1395a(b)(6)(C).  Section 1395u(b)(18)(C) and the relevant parts of § 1395x(r), in turn, specify certain kinds of healthcare professionals without any reference to any protected or suspect classification mentioned above.  *See generally* §§ 1395x(r), 1395u(b)(18)(C).

In short, no suspect classification is at issue in this case.  Accordingly, Plaintiffs' Fifth Amendment equal-protection challenge fails so long as § 1395a(b) clears the low bar of rational-basis review.  *See Eknes-Tucker*, 80 F.4th at 1226.

14

### C.    The Exclusion of Physical Therapists from Medicare's Opt-Out Provisions Satisfies Rational-Basis Scrutiny

Because § 1395a(b) implicates neither a fundamental right nor a suspect classification, it is subject to no more than rational-basis review.  And no matter whether in the equal-protection context or the substantive-due-process context, rational-basis review is "virtually identical."  *Ga. Elec. Life Safety & Sys. Ass'n, Inc. v. City of Sandy Springs, Ga.*, 965 F.3d 1270, 1275 (11th Cir. 2020); *see also ibid.* (collecting cases).  At that level of scrutiny, the challenged action "can only be invalidated if it is so unrelated to the achievement of any combination of legitimate purposes that [the Court] can only conclude that the legislature's actions were irrational."  *Ibid.* (quotation cleaned).

That evaluation is "highly deferential to government action," and proceeds in two parts.  *Ibid.*  First, the Court considers "whether the government has the power or authority to regulate the particular area in question, and whether the proposed regulation has a legitimate governmental purpose."  *Ibid.* (quotation cleaned).[1]  Second, the Court considers whether "there is any conceivable basis for the legislature to believe that the means they have selected will tend to accomplish the desired end, and if the method chosen to accomplish the stated goal bears a rational relation to the ultimate objective."  *Ibid.* (quotation cleaned).  "These requirements are generally easily met," and "[a] searching inquiry into the validity of legislative judgments concerning economic regulation is not required."  *Ibid.* (quotation cleaned).

In fact, the Government "has no obligation to produce evidence to sustain the rationality of" the challenged provision at all.  *Leib v. Hillsborough Cnty. Pub. Transp.*

---

[1] "[W]hether the government has the power or authority to regulate the particular area in question" is discussed at Part II, *infra*.

15

*Comm'n*, 558 F.3d 1301, 1306 (11th Cir. 2009). Instead, the "statute is presumed constitutional, and the burden is on the one attacking the law to negate every conceivable basis that might support it, even if that basis has no foundation in the record." *Ibid.*; *see also Estrada v. Becker*, 917 F.3d 1298, 1311 (11th Cir. 2019) (same). So long as "any reasonably conceivable state of facts … could provide a rational basis for" the statute, it must be upheld. *Moore*, 410 F.3d at 1346 (quoting *FCC v. Beach Commc'ns.*, 508 U.S. 307, 313 (1993)). To that point, "it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged [statute] actually motivated the legislature." *Ibid.* (quoting *Beach Commc'ns.*, 508 U.S. at 315). And Congress's legislative choice "may rely upon conjecture," *Jackson v. State Bd. of Pardons and Paroles*, 331 F.3d 790, 797 (11th Cir. 2003), or "may be based on rational speculation unsupported by evidence or empirical data," *Moore*, 410 F.3d at 1346 (quoting *Beach Commc'ns.*, 508 U.S. at 315), so long as the rational relationship between the statute's purpose and the means adopted to effectuate that purpose is "at least debatable," *Gary*, 311 F.3d at 1390. *See also 6064 Noa, LLC v. City of Orlando*, No. 6:24-cv-1665-WBB, 2025 WL 2854473, at *4 (M.D. Fl. Sept. 10, 2025) (describing same standard for rational-basis review).

Given that "very deferential" standard, "[a]lmost every statute subject to" rational-basis review "is found to be constitutional." *Moore*, 410 F.3d at 1346–47. Section 1395a(b) is no different. To put that provision in context: Medicare is a national, federally administered and funded program designed to promote Congress's legitimate interests in the health and welfare of millions of qualifying Americans. First enacted in 1965, Congress specifically sought to provide those Americans with cost-effective,

16

readily accessible healthcare by setting rules requiring healthcare professionals around the country to charge Medicare beneficiaries no more than a Government-set rate for covered services. *See generally* Pub. L. 89-97, 79 Stat. 286; *see also* 42 U.S.C. § 1395w-4(g)(1)–(2); 42 C.F.R. §§ 414.48, 424.55. Payments to those healthcare professionals would then be largely subsidized by the Government, thereby holding down costs for both Medicare beneficiaries and the Government itself, all while providing a fair rate of compensation for services rendered.

Section 1395a(b) represents Congress's considered judgment, more than three decades after the initial enactment of Medicare, to permit certain physicians and practitioners to opt out of that scheme. For some—but not all—healthcare professionals, it allows such a professional to enter into a "private contract" with a Medicare beneficiary for the provision of services that would otherwise be subject to Medicare's fee caps. § 1395a(b)(1). The private contract would permit that healthcare professional to charge the Medicare beneficiary any agreed-upon amount for the covered service, but only if the contract satisfies various statutory requirements. *See* § 1395a(b)(2). Further, the opportunity to enter into such contracts at all is contingent on the eligible healthcare professional filing an affidavit with HHS agreeing not to accept *any* Medicare payments for various services provided to *any* Medicare beneficiary for a two-year period. *See* § 1395a(b)(3).

Most importantly for this case, the extent to which Congress permitted opt-outs from Medicare is reflected in the kinds of healthcare professionals Congress permitted to enter into individualized private contracts with Medicare beneficiaries. It specifically limited such professionals to the kinds of "practitioner[s]" listed at § 1395u(b)(18)(C) and

17

"physician[s]" listed in "paragraphs (1), (2), (3), and (4)"—but not paragraph (5)—of § 1395x(r).  *See* § 1395a(b)(6)(B)–(C).  Omitted from the opt-out scheme are, for instance, chiropractors, who are listed at § 1395x(r)(5); and physical therapists, who are implicitly excluded by their omission from § 1395u(b)(18)(C) and § 1395x(r) altogether.

That omission easily satisfies rational-basis review.  When Congress adopted the opt-out scheme, it took the calculated risk that too many healthcare professionals would avail themselves of that scheme.  After all, if *every* eligible healthcare professional accepted the opportunity to opt out, that would leave Medicare beneficiaries, as a whole, with none of the protections Congress intended to provide them under the remainder of Medicare's rules—including its assignment rules at 42 U.S.C. § 1395u, charge-limiting rules at 42 U.S.C. § 1395w-4(g)(1), and mandatory-claim-submission rules at 42 U.S.C. § 1395w-4(g)(4).  Further, the ability of healthcare professionals to opt out of Medicare risks creating a two-tiered system by which wealthy Medicare beneficiaries may continue to afford healthcare at the higher prices permitted under private contracts, while less affluent Medicare beneficiaries find themselves with fewer professionals willing or able to serve their needs.  *See Private Contracting in Medicare: Hearing on S. 1194 before the S. Fin. Comm.*, 105th Cong. 69 (1998) (Prepared Statement of Nancy-Ann Min DeParle, Administrator, Health Care Financing Administration) ("This would undermine Medicare as a social insurance program and turn it into a program with two classes of care.").  Similarly, those leading specialists in highest demand would be able to choose compensation only by private contract, putting them out of financial reach for all Medicare beneficiaries except the highest bidders. *See id.*  Further, every professional who avails themselves of the opt-out scheme

represents a decrease in the number of professionals serving Medicare patients in that professional's geographic area.  *See id.*  And finally, professionals who opt out of Medicare are free to charge any price for their services, leaving potentially vulnerable beneficiaries responsible for footing the entirety of the bill.  *See id.* at 68.

Congress made the rational decision not to take those risks with respect to the services of physical therapists.  Correspondingly, it is "at least debatable," *Gary*, 311 F.3d at 1390, that Congress will more readily accomplish the "legitimate governmental purpose," *City of Sandy Springs*, 965 F.3d at 1275, of ensuring cost-effective and accessible physical-therapist services for Medicare beneficiaries around the country. Refusing to permit physical therapists into the opt-out scheme obviously "bears a rational relation" to that "ultimate objective" because of the "conceivable basis" that Congress was trying to avoid a two-tiered system of care while encouraging maximal physical-therapist participation in Medicare, thereby ensuring maximal access to physical-therapist services for Medicare beneficiaries.  *Ibid.*

Congress may also have had other reasons for choosing to exclude physical therapists from the opt-out provisions.  For instance, it may have deemed physical therapy so important for Medicare-eligible Americans that it saw fit not to risk any reduction in access.  It may have thought that too few physical therapists existed to serve the needs of Medicare-eligible Americans, making it undesirable to allow physical therapists to opt out of the Medicare scheme.  Or it may have thought physical therapists to be more likely to inflict fraud or abuse on a vulnerable Medicare-eligible population.

19

Or Congress could have feared the weakening of physician oversight of physical-therapy services.  For example, Medicare Part B covers "outpatient physical therapy services," 42 U.S.C. § 1395k(a)(2)(C), which includes services furnished pursuant to "a plan prescribing the type, amount, and duration of physical therapy services … [that] *has been established by a physician* . . . or by a qualified physical therapist and is *periodically reviewed by a physician*," 42 U.S.C. § 1395x(p)(2) (emphasis added). Similarly, even at the time the opt-out provision was enacted, Medicare beneficiaries could only receive coverage for outpatient physical therapy services if they were under the care of a physician who certified that patient's need for such services.  *See* 42 C.F.R. § 424.24(c) (1997).  Accordingly, Congress may have concluded that if physical therapists were permitted to opt out of Medicare, physician oversight of physical-therapy services could be weakened or eliminated, thereby undermining the coordination of care or creating confusion for Medicare beneficiaries.

Whatever the reason, it is valid for rational-basis purposes even if "unsupported by evidence," *Moore*, 410 F.3d at 1346, so long as the rational relationship between the statute's means and ends is "debatable," *Gary*, 311 F.3d at 1390.  And here, the "conceivable" rationales described above suffice to satisfy the "highly deferential" rational-basis inquiry in this case.  *Ibid.*  So long as at least one of them does, courts may not "question … the 'wisdom, fairness, or logic'" of the legislative choices embodied in § 1395a(b).  *6064 Noa*, 2025 WL 2854473, at *5 (quoting *Beach Commc'ns.*, 508 U.S. at 313); *see also Swisher Int'l, Inc. v. Shafer*, 550 F.3d 1046, 1060 (11th Cir. 2008) (under rational-basis test, "perfection is not required").  After all, "[g]overnmental bodies have wide latitude in enacting social and economic legislation," and "the federal courts

do not sit as arbiters of the wisdom or utility of these laws."  *Gary*, 311 F.3d at 1339 (quotation cleaned).  Instead, "[w]here," as here, "there are plausible reasons for Congress'[s] action," the Court's "inquiry is at an end."  *Beach Commc'ns.*, 508 U.S. at 313–14; *Cf. United Seniors Ass'n*, 2 F. Supp. at 42 (holding that § 1395a(b) passes rational-basis test).

*     *     *

Because the exclusion of physical therapists from Medicare's opt-out provisions implicates neither a fundamental right nor a suspect classification, it is subject to no more stringent judicial review than rational-basis scrutiny.  And because that exclusion satisfies such scrutiny, it violates neither due-process nor equal-protection rights under the Fifth Amendment.  Accordingly, the Court should dismiss Counts I and II of Plaintiffs' Complaint.

**II.    CONGRESS'S POWER TO REGULATE INTERSTATE COMMERCE INCLUDES THE EXCLUSION OF PHYSICAL THERAPISTS FROM MEDICARE'S OPT- OUT PROVISIONS**

"Every law enacted by Congress must be based on one or more of its constitutionally enumerated powers."  *Nat'l Small Bus. United v. U.S. Dep't of Treasury*, 161 F.4th 1323, 1328 (11th Cir. 2025).  "One of those enumerated powers is the power 'to regulate Commerce … among the several States.'"  *Ibid.* (quoting U.S. Const. art. I, § 8, cl. 3).  In expounding that power, "the Supreme Court has identified three categories of activity that Congress may regulate": "(1) channels of interstate commerce; (2) instrumentalities of interstate commerce, or persons or things in

21

interstate commerce; and (3) activities that substantially affect interstate commerce." *Ibid.*

The Government does not concede that Congress could have enacted § 1395a(b) under *only* one of those categories (or, for that matter, only under its interstate-commerce power). *Cf. United Seniors Ass'n*, 2 F. Supp. at 42 (upholding limitation on private-contracting rights under Congress's spending power). But here, the Court can most readily dispose of Plaintiffs' interstate-commerce claim by evaluating the statute under the third category of permissible regulation—i.e., whether § 1395a(b) passes the "substantial effects" test. *See ibid.* As relevant here, that test is satisfied when the challenged statute is "directed at some kind of commercial or economic activity" and reflects Congress's "rational[] conclu[sion] that the regulated activity *in the aggregate* substantially affects interstate commerce." *Ibid.* (emphasis added). And "the connection between the challenged law and commerce" need not be "airtight": "[i]t is enough that the regulated activity involves some sort of economic endeavor with an apparent commercial character." *Ibid.* (quotation cleaned).

The implications of that test are as sweeping as they sound. Supreme Court caselaw "firmly establishes Congress's power to regulate [even] *purely local* activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce." *Ala.-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250, 1272 (11th Cir. 2007) (quoting *Gonzales v. Raich*, 545 U.S. 1, 17 (2005)) (emphasis added). Even wholly *intrastate* activity, in other words, may be regulated under Congress's interstate-commerce power if such regulation is "an essential part of a larger [interstate] regulation of economic activity, in which the regulatory scheme could be

22

undercut unless the intrastate activity were regulated." *Ibid*.  And in such instances, courts have no power "to excise, as trivial, individual instances" of the regulated activity on the theory that the individual instance does not, by itself, affect interstate commerce. *Id.* at 1274.  "When a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence."  *Raich*, 545 U.S. at 17 (quotation cleaned).

Section 1395a(b) easily satisfies that standard.  Through the Medicare program generally, and its opt-out scheme specifically, Congress has regulated a "class of activities" involving "some sort of economic endeavor": the provision of professional healthcare services.  And Medicare itself is the epitome of a "lengthy and detailed" scheme "creating a comprehensive framework" for the regulation of a national economic market.  *Raich*, 545 U.S. at 24.  As the Fifth Circuit has correctly observed, "it cannot seriously be contended that Medicare … [does] not affect commerce": "[t]he provision of medical services affects interstate commerce because" healthcare professionals around the country "serve nonresident patients and receive reimbursement though Medicare payments."  *United States v. Ogba*, 526 F.3d 214, 238 (5th Cir. 2008) (quotation cleaned).  Accordingly, Medicare constitutes, as a whole, the kind of interstate "regulation of economic activity" that falls within the wheelhouse of Congress's power to regulate interstate commerce.  *Kempthorne*, 477 F.3d at 1272.

The next question, then, is "whether Congress could have rationally concluded that" the exclusion of physical therapists from Medicare's opt-out provisions "was an essential part of the larger regulatory scheme" that is Medicare.  *Id.* at 1274.  The answer is obviously yes.  The purpose of the overall Medicare scheme is to ensure

23

widespread access to cost-effective medical care for eligible Americans.  And for the reasons already described above, Congress could have rationally concluded that excluding physical therapists from Medicare's opt-out provisions would further that objective by making physical therapy more available and affordable for Medicare beneficiaries.  *See supra* pp. 18–21. "Congress was not constitutionally obligated to carve out an exception for" physical therapists "from the otherwise comprehensive statutory scheme that is the" national Medicare program—even if Congress had already created an optional exception for other kinds of healthcare professionals.  *Cf. Kempthorne*, 477 F.3d at 1276.

Finally, the Court is left to consider whether Congress could reasonably conclude that the effects of allowing physical therapists to opt out of Medicare would, in the aggregate, substantially affect interstate commerce or "undercut" the Medicare scheme "unless the intrastate [opt-outs] were regulated."  *Id.* at 1272; *see also Raich*, 545 U.S. at 22 (Court need not determine whether "activities, taken in the aggregate, substantially affect interstate commerce *in fact*, but only whether a rational basis exists for so concluding" (quotation cleaned) (emphasis added)).  Again, for the reasons described above, the answer is yes.  Congress could have reasonably concluded that allowing physical therapists to opt out of Medicare might, in the aggregate, substantially affect the national market for physical therapy among Medicare-eligible Americans by decreasing their access to physical-therapy services and raising the costs of physical therapy for Medicare beneficiaries around the country.  *See supra* pp. 18–19.  Plaintiffs' invocation of their purely intrastate conduct cannot shield them from Congress's reach; that the broader Medicare scheme "ensnares some purely intrastate activity is of no

moment." *Raich*, 545 U.S. at 22. "'It is enough that the challenged provisions are an integral part of the regulatory program and that the regulatory scheme when considered as a whole' can survive a Commerce Clause challenge." *Kempthorne*, 477 F.3d at 1276 (quoting *Hodel v. Indiana*, 452 U.S. 314, 329 n.17 (1981)).

Because § 1395a(b) regulates economic activity that is both an essential part of the overall Medicare scheme and substantially affects, in the aggregate, interstate commerce as governed by that scheme, the challenged opt-out provisions easily pass muster under the "substantial effects" test. Accordingly, § 1395a(b) is well within Congress's power to enact under its interstate-commerce powers. The Court should dismiss Count III of Plaintiff's Complaint.

## CONCLUSION

The Court should dismiss Plaintiffs' Complaint in its entirety.

25

FEBRUARY 20, 2026                    *Respectfully submitted,*

                                     BRETT A. SHUMATE
                                     Assistant Attorney General
                                     Civil Division

                                     MICHELLE BENNETT
                                     Assistant Branch Director
                                     Federal Programs Branch

                                     */s/ Cesar Azrak*
                                     CESAR AZRAK
                                     Trial Attorney
                                     United States Department of Justice
                                     Civil Division, Federal Programs Branch
                                     1100 L Street, NW
                                     Washington, DC 20005
                                     Telephone: (202) 305-0693
                                     Email: cesar.e.azrak@usdoj.gov

                                     *Counsel for Defendant*

## LOCAL RULE 3.01(g) CERTIFICATE

Defendant Secretary Robert Kennedy, Jr., hereby certifies to have complied, through counsel, with the requirements of Local Rule 3.01(g).  Defendant's counsel has conferred with Plaintiffs' counsel by email regarding this motion but could not agree on the resolution of any part thereof.

*/s/ Cesar Azrak*
CESAR AZRAK

*Counsel for Defendant*
